## Corbett *versus* Lewis and Nelson.

1. Lewis and Corbett made two agreements of the same date; one, that Corbett was to superintend the erection of saw-mills on Lewis's land, Lewis to furnish money, materials, &c., and Corbett to saw and deliver to Lewis at Pittsburgh lumber at a price stipulated; the other, that when Corbett should have furnished to Lewis lumber sufficient to pay for the mills and manufacture, he was to receive one-third "in the land, mills, &c.," for which Lewis was then to give him a deed; Lewis to have entire control of the sale of the lumber, until he should have received sufficient "to pay all advances for the purchase of land, erection of mills, and cost of manufacturing and delivery in market." *Held*, that the two agreements were one contract, and Corbett acquired an equitable estate in one-third the land, &c., to be perfected by a conveyance of the legal title when he had delivered sufficient lumber to pay for mills, &c.

2. Until such delivery, Lewis was to have entire control of the sale of the lumber.

3. If Corbett had not delivered lumber sufficient and set up a claim of property to lumber, manufactured at the mills, in his possession, Lewis could maintain replevin for it. Corbett's equitable title to the land did not entitle him to the possession of the lumber for purposes of sale.

4. If one tenant in common agree that if his fellows will furnish supplies for the manufacture of lumber they shall have the exclusive control of the sale; this will give them the exclusive possession for that purpose.

5. Their liability is to account to him for the proceeds of sale, which could be enforced by an action of account or bill in equity.

6. The court below having charged that if Corbett had not delivered sufficient lumber to pay the advances, &c., he had no title to the lumber under the contract. *Held*, not to be error.

7. By the contract Corbett was to deliver the lumber in Pittsburgh; this was for the benefit of Lewis, and he might waive his rights and demand delivery above Pittsburgh.

8. The property in the lumber was in Lewis until Corbett had reimbursed the advances, and a sheriff's sale of it, as the property of Corbett, would have passed no title.

ERROR to the District Court of *Allegheny county*.

This was an action of replevin by Samuel Lewis and William Nelson against Warfield W. Corbett, for twelve creek-rafts of boards, containing about 600,000 feet, valued at $18,000. The writ was issued April 8th 1865, and served the same day. The defendant gave a claim-property bond and retained the lumber, and pleaded property in himself.

On the 28th of May 1863, the plaintiffs and defendant entered into the two following agreements under seal:—

"Memorandum, that W. W. Corbett has this day agreed, with Samuel Lewis and William Nelson, to superintend the building and erection of a steam circular saw-mill, shingle-mill and other necessary buildings for manufacturing boards and shingles upon the land owned by them in Union and Eldred townships, Jefferson county, Pa.

"Said Lewis & Nelson to furnish all the money and materials

[Corbett *v.* Lewis.]

for said purpose, and also to make a road from the mills to the creek; and after the mills are ready to run, said Corbett agrees to saw, haul and deliver at Pittsburgh, the boards to the said parties of the first part, at the rate of $8 per thousand for each and every thousand feet of boards, and $1.75 for the shingles per thousand; said Lewis & Nelson to furnish said Corbett from time to time, as he may need it, with money or provisions to carry on the manufacturing, &c.; said Corbett to make said boards and shingles in workmanlike manner. Any boards that may be lost after rafted in either the creek or river, Corbett is to lose the rafting and running, and Lewis & Nelson the manufacturing and hauling. The rent for the landing is to be paid by Lewis & Nelson. This agreement to expire in five years after this date.

" Witness our hands and seals this 28th day of May 1863."

" Memorandum: That Samuel Lewis and William Nelson have this day bought about 266 acres of pine-timbered land in Union and Eldred townships, Jefferson county, Pennsylvania, known as the Shannon lot, and for which they have to pay $5860. They also agree to furnish money and material from time to time, as it may be required, to build a steam circular saw and shingle mill, and other necessary buildings, for the purpose of manufacturing boards and shingles. It is agreed by the parties of the first part that W. W. Corbett shall superintend the erection of said mill, and manufacturing and running boards and shingles to market; and at such time as said Corbett shall deliver to Lewis and Nelson boards and shingles sufficient to pay the cost of saw-mills and manufacturing, he is to receive one undivided third in the lands, mills, &c. And the parties of the first part agree at such time to execute a deed of general warranty to said party of the second part, of one undivided third part of the land and buildings: said Lewis and Nelson to have full and entire control of the sale of said lumber, until such time as they shall have received sufficient lumber in market to pay all advances for purchase of land, erection of mills, and cost of manufacturing and delivery in market.

" Witness our hands and seals this 28th May 1863."

From the evidence, it appeared that the mill and other buildings were finished about October 26th 1863, up to which time the plaintiffs had furnished money, materials, &c., for the erection of the mill, amounting to about $15,000, and subsequently, up to April 7th 1865, they paid to the defendant nearly $11,000 more. It appeared also that about 1,000,000 feet of lumber had been sawed at the mills by the defendant, and that he had delivered to the plaintiffs 468,000 feet before the commencement of the suit. Of the lumber in controversy, there were about 200,000 feet also sawed at the plaintiffs' mills, which appeared to have been manufactured from logs cut from other lands than the plaintiffs', which

[Corbett *v.* Lewis.]

the defendant alleged he had purchased for himself; but which the plaintiffs alleged he purchased and manufactured as their agent. The defendant also alleged, and it did not appear to be controverted by the plaintiffs, that there were about 15,000 feet more in the lumber taken possession of by the sheriff, which the defendant bought and put on the rafts after they had started. The defendant, about April 5th 1865, brought the rafts to two points, "Logan's" and "Ireland," above Pittsburgh, where he stopped it. Some difficulty arising between the plaintiffs and defendant about the lumber, the defendant refused to deliver it, and the replevin was issued.

The court declined to affirm the 2d, 3d, and 5th points of the defendant, which were as follows:—

2. By the terms of the agreements the defendant, Corbett, was a purchaser of an undivided one-third interest in the mills, land and lumber growing thereon and manufactured therefrom; and being such purchaser, he thereby became a part owner, either as partner or tenant in common. He was, therefore, lawfully in the possession of the said mills, land and lumber as such part owner, and the plaintiffs cannot deprive him of such possession of the lumber manufactured from timber growing upon said lands by an action of replevin.

3. Even if this were otherwise, the defendant was entitled to the possession of the lumber in controversy until it arrived in Pittsburgh, until which time the plaintiffs could not legally interfere with his possession; and if the action was commenced while the lumber was *in transitu* and before its arrival at that point, the plaintiffs cannot recover.

5. As to that portion of the lumber which was manufactured out of timber not growing upon or procured from the lands claimed by plaintiffs, the plaintiffs cannot recover.

The last point was submitted as matter of fact, and all of them referred for answer to the charge.

The court (Williams, A. J.) further charged, amongst other things:—

"1. He contends that under the terms of the contract, he became the owner of the one undivided third part of the mill, land and timber thereon, and of the lumber manufactured therefrom, either as a part owner or tenant in common with the plaintiffs; and that as part owner he was lawfully in possession of so much of the said lumber as was manufactured out of the timber which grew on said land, and, therefore, replevin will not lie at the suit of the plaintiffs against him for the possession thereof. He contends that upon the execution of the contract, he became entitled to, and possessed of, an immediate, present and vested interest in the land and timber growing thereon, and, consequently, that he was a part owner of the lumber manufactured therefrom, although

[Corbett v. Lewis.]

he may not have delivered to the plaintiffs a sufficient quantity of lumber to pay the cost of the land, mill and other buildings, and the expense of manufacturing and delivering the said lumber in market as required by his contract. But this, as it seems to me, is not a reasonable and proper construction of the contract, and could not have been the intention of the parties. The contract, by its very terms, is executory, and was not intended as a conveyance of the undivided third interest in the land, mill, &c., but only as an agreement for a conveyance when the condition upon which it was to be made should be fully performed. It was manifestly the intention of the parties that the defendant should not have any vested interest or estate in the land, mill, &c., until after the delivery to the plaintiffs of boards and shingles sufficient to pay the cost thereof, and the expenses of manufacturing and delivering the said lumber. When this should be done, or in the language of the contract, ' at such time he is to receive one undivided third interest in the lands, mills, &c. ;' and the plaintiffs ' agree *at such time* to execute a deed of general warranty' to him for the one undivided third part thereof. The intention of the parties to a written agreement is the criterion by which to determine whether it operates as a present conveyance or as an executory contract. The contract in this case is clearly executory, and therefore it vested in the defendant no present interest or estate in the land and timber growing thereon, and consequently no title or interest could pass to him thereby, to the lumber manufactured out of the said timber. If, therefore, the defendant, at the date of the issuing and service of the writ of replevin, had not delivered to the plaintiffs sufficient lumber to pay all advances for purchase of land, erection of mills and cost of manufacturing and delivering said lumber in market, he had no title, under and by virtue of the said contract, to the lumber in question, so far as the same was manufactured out of the timber grown and cut on the plaintiffs' land. The plaintiffs were not only the owners of the said lumber, but upon its arrival in Pittsburgh, they were entitled, by the provisions of the contract, to its possession, in order to make sale thereof. It was the duty of the defendant, under his contract, to deliver it to them. It was expressly stipulated that the plaintiffs should have full and entire control of the sale of said lumber until such time as they shall have received sufficient lumber to pay all advances for purchase of land, erection of mills and cost of manufacturing and delivering in market. In order to make sale of the lumber the plaintiffs must have possession thereof. There could be no effectual sale without delivery of possession, and there could be no delivery of possession by the plaintiffs if it was not in their custody or control, or in other words, in their actual possession.

" The jury are, therefore, instructed that the plaintiffs, by virtue

[Corbett *v.* Lewis.]

of their ownership of the mill, land and timber thereon, had a good title to the lumber manufactured therefrom by the defendant under his contract with them.   Such a title as will enable them to maintain replevin therefor, if they were entitled to its immediate possession at the date of the suing out and service of the writ; and that the defendant had no title to the said lumber as part owner thereof, under and by virtue of his contract with the plaintiffs, unless he had delivered to them lumber sufficient to reimburse their advancements for the purchase of said lands, the erection of the mill, &c., and the cost and expense of manufacturing and delivering the said lumber in market.

" 2. But the defendant contends that even if the title to the said lumber was in the plaintiffs, they had no right to the possession thereof until its delivery to them at Pittsburgh; and that having issued their writ of replevin therefor before its arrival in Pittsburgh, they are not entitled to maintain the action and the verdict must be for the defendant.

*        *        *        *        *        *        *

" The jury are instructed, that if they find that the defendant, after landing the lumber above the city, claimed it as his own, and did not intend to deliver it to the plaintiffs at Pittsburgh, but was intending and endeavoring to sell and dispose of it as his own, then the plaintiffs were justified in asserting their right to the possession of the said lumber and replevying it where it then lay; and if when the writ was served the defendant, instead of surrendering the said lumber to the sheriff, or with his permission, delivering it to the plaintiffs, claimed it as his own, gave the sheriff a claim-property bond therefor, retained possession and afterwards sold and disposed of the same as his own property, he cannot, under his plea in this case, defeat the plaintiffs' right to maintain replevin therefor, on the ground that by the terms of the contract he was entitled to its possession and custody until its arrival and delivery in Pittsburgh to the plaintiffs.

" 3. But there is another ground of defence set up by the defendant as to a part of the plaintiffs' claim in this case.

" The defendant alleges, and has given evidence tending to show, that a portion of the lumber composing the rafts in controversy, viz., from one hundred and ninety thousand to two hundred thousand feet, was manufactured, not from timber cut on plaintiffs' land, but from timber put in by Taylor from the Summerville tract, and from logs furnished by Clark and Snyder.   He alleges that he purchased and paid for the timber furnished by the said parties, and that the plaintiffs are not entitled to recover for the lumber manufactured therefrom. The plaintiffs, on the other hand, allege that the defendant purchased and procured the said timber as their agent, and paid for the same with funds furnished by them, and they have given some evidence in support of this allegation,

[Corbett v. Lewis.]

the weight of which is for the jury. If the defendant procured or purchased the timber as plaintiffs' agent, and paid for it with their funds, then they have the same title to the lumber manufactured therefrom, as to the lumber manufactured from the timber cut on their own land. But if it was purchased and paid for by the defendant, not as agent of the plaintiffs, but on his own account and with his own money, then the boards manufactured therefrom would not belong to the plaintiffs, although sawed by the defendant at their mill and without their permission. If the defendant, in sawing the said timber at the plaintiffs' mill, was guilty of a violation of his contract with the plaintiffs, that would not vest in them a title to the lumber sawed out of the defendant's logs, and they can have no remedy, therefore, in this form of action.

"The plaintiffs further contend, that even if the jury should find that the said timber was purchased and sawed by the defendant on his own account, they are still entitled to recover for the same in this action, because the defendant wrongfully mixed the lumber manufactured therefrom with the plaintiffs', rafting the same indiscriminately with theirs, so that it could not be distinguished or separated therefrom.

＊　　　＊　　　＊　　　＊　　　＊　　　＊　　　＊

"If, therefore, the Taylor, Clark and Snyder logs were purchased and paid for by the defendant, with his own money, and the jury find that the defendant wilfully and fraudulently mixed the lumber manufactured therefrom with the plaintiffs', rafting the same indiscriminately together, so that it could not be distinguished or separated therefrom, and its original value ascertained, the defendant must lose it and the plaintiffs will be entitled to recover therefor. But if the mixing was accidental, and without any fraudulent intent on part of the defendant, and the lumber could be separated and distinguished, and its original value ascertained and distinguished, so as to do no injustice to the parties, the case would be different; or if the lumber was rafted in separate rafts, the defendant, under the plea of property, would establish a good defence to so many of the rafts as, by the showing of the evidence, belonged to him.

"4. In addition to the lumber manufactured from the Taylor, Clark and Snyder logs, the defendant contends that there were 15,000 feet of lumber which which had been sawed with an upright saw at the ' Shick Mill,' and which were put on the rafts after they left ' Coder's Dam,' and could be readily separated and distinguished from the remaining portion of the lumber composing the rafts. The defendant contends that there can be no recovery by the plaintiffs for the 15,000 feet which he had purchased and put on the tops of the rafts while on their way down the river. ＊ ＊ ＊ I do not understand the plaintiffs' counsel as claiming the right to recover for the 15,000 feet. They allege

[Corbett *v.* Lewis.]

that the rafts, as made up at 'Coder's Dam,' contained 50,000 feet each, making in all 600,000 feet, exclusive of the 15,000 feet subsequently put on at 'Hesses.' Whether the said rafts contained 50,000 feet of lumber each, exclusive of the 15,000 feet, is a question of fact for the determination of the jury."

There was a verdict for the plaintiffs for $17,514.30.

The errors assigned were the answers of the court to the defendant's 2d, 3d and 5th points: also " all that part of the general charge which relates to the proper construction of the articles of agreement of the 28th of May 1863, and especially in that part of the said charge in which the court instructed the jury that, ' The contract in this case is clearly executory, and, therefore, it vested in the defendant no present interest or estate in the land and timber growing thereon; and, consequently, no title or interest could pass to him thereby, to the lumber manufactured out of said timber.' "

Also the instructions, " If, in violation of his" (the defendant's) " verbal promise, and his duty under the written contract, he was not intending to deliver it," (the lumber) " to the plaintiffs or their vendee,—if he was claiming and endeavoring to sell and dispose of the lumber as his own, the plaintiffs were justified in asserting their title to it by replevin, although it had not been delivered to them at Pittsburgh:" and " If the defendant procured or purchased the timber as plaintiffs' agent, and paid for it with their funds, then they have the same title to the lumber manufactured therefrom as to the lumber manufactured from the timber cut on their own land."

*B. F. & A. G. Lucas*, for plaintiff in error.—The question is not whether the contract is executory or executed: it is conceded that it is executory, but it nevertheless vests a present interest in the land: Willing *v.* Brown, 7 S. & R. 467; Kerr *v.* Day, 2 Harris 112; Russell's Appeal, 3 Id. 319; Longwell *v.* Bentley,' 11 Id. 102, 103; Siter's Appeal, 2 Casey 178. An inchoate title in the defendant is sufficient to defeat an action of replevin: Cromelien *v.* Bink, 5 Casey 522.

If the articles of agreement of the 28th of May 1863, vested in Corbett a title, either legal or equitable, to the undivided third part of the lands, mills, timber, &c., and if he held the same with the plaintiffs, either as partner or tenant in common, this action cannot be maintained: Wilson *v.* Gray, 8 Watts 35, 36.

It is manifest, from the two articles of agreement, that the intention of the parties was that Corbett should have a present interest in the land, mills and lumber.

Corbett had the exclusive possession and also the exclusive right to the lumber till it arrived at Pittsburgh. He was responsible for its delivery and could have maintained an action for

[Corbett v. Lewis.]

injury to it. If it had been sold by the sheriff as Corbett's, the title would have passed: Mitchell v. Commonwealth, 1 Wright 187.

A defendant in replevin is not bound to state, at the service of the writ, the specific grounds on which he claims the property: Murray v. Paisley, 1 Yeates 198.

There was no evidence that Corbett was endeavoring to sell the property as his own, prior to issuing the writ, and this should not have been submitted to the jury: Urkett v. Coryell, 5 W. & S. 60; Switland v. Holgate, 8 Watts 385; Dubois v. Lord, 5 Id. 49; Kerr v. Wright, 1 Wright 196.

The confusion of goods which would vest them in the party injured, must be made wilfully and for a fraudulent purpose: McDowell v. Rissell, 1 Wright 165. Here the mixing was not of that character.

*J. Barton*, for defendants in error.—The contract was executory: Ogden v. Brown, 9 Casey 247; Stewart v. Lang, 1 Wright 201. In this case the vendee's interest was dependent upon his services to be performed for the vendors.

The question whether Corbett intended to deliver the lumber was fairly submitted to the jury. The owner of goods *in transitu* may reassert his possession at any time, if he finds the carrier is about to dispose of them fraudulently or convert them. The plaintiffs might have enforced the delivery at any place before the lumber reached Pittsburgh, if they had found there a better market.

The counsel cited Agnew v. Johnson, 5 Harris 373; Dunham v. Rogers, 1 Barr 255; Fisher v. Whoollery, 1 Casey 197; Ruch v. Morris, 4 Id. 245.

The opinion of the court was delivered, January 7th 1867, by

WOODWARD, C. J.—The two agreements of 28th May 1863, which are to be taken together as constituting only one, define and regulate all the rights of the parties that are litigated in this suit. Beyond all doubt, Corbett acquired an equitable estate in the lands, mills, &c., to be perfected by a conveyance of the legal title to an undivided third of the premises at such time as he should have manufactured, in the manner provided, and delivered to Lewis & Nelson, boards and shingles sufficient to pay the cost of saw-mills and manufacturing. But, until that time arrived, Lewis & Nelson were to have full and entire control of the sale of said lumber.

Now, this action of replevin is founded on the assertion that Corbett had not attained the limit prescribed in the agreements, was not, therefore, entitled to a conveyance of title to a third of the premises, and yet, that instead of delivering the lumber to

[Corbett *v.* Lewis.]

Lewis & Nelson, at Pittsburgh, as provided in the agreement, he had set up a claim of property to it, and was about to dispose of it on his own account before it reached Pittsburgh. These grounds, if well laid in the evidence, were sufficient to sustain the action. For, though the learned judge may have put it too strongly when he denied that Corbett could have *any* interest in the lands until he had fully paid up, yet his equitable interest in the land did not entitle him to the possession of the manufactured lumber for *purposes of sale.* For purposes of manufacture and transportation he had the lawful possession of the lumber, but full and entire control of the sale of said lumber was expressly vested in Lewis & Nelson, and when it was brought to Pittsburgh, or any other point of market at which they chose to exercise their exclusive right of sale, he was bound to deliver it to them, and they might enforce their rights and his duty by an action of replevin. His equitable and contingent interest in the land gave him no right to control the sale of the manufactured lumber. And this, not because his title was inchoate, but because he had divested himself of dominion over the lumber by the agreement. His rights were all derived from the agreement, and they must be limited and controlled by it. One tenant in common of lumber-lands may certainly agree that if his co-tenants will furnish all the supplies for the manufacture of the lumber, they shall have exclusive control of the sale of it. And this will give them the right to exclusive possession for the purposes of sale. Their liability is to account to him for the proceeds of the sale, but their right to make the sale, and for this purpose to demand the possession, is as unquestionable as the terms of the agreement. Corbett was entitled to a credit on the land contract of $8 per 1000 feet for the boards, and $1.75 per 1000 for the shingles, and an action of account or a bill in equity would have been the appropriate form for enforcing this right, but the court submitted the question to the jury in this action. "If, therefore," said the learned judge, "the defendant, at the date of issuing and service of the writ of replevin, had not delivered to the plaintiffs sufficient lumber to pay all advances for purchase of land, erection of mills, and cost of manufacturing and delivering said lumber in market, he had no title under and by virtue of the said contract to the lumber in question, so far as the same was manufactured out of the timber grown and cut on the plaintiff's land."

To this the plaintiff in error has no right to object, for it gave him a chance, in this action, to satisfy the jury that he had paid for his third of the land, and if they had found the fact so, the consequence would have been fatal to the plaintiffs' action, for then Corbett, having performed his part as a purchaser, would have been entitled to his deed, would have been a tenant in common, the exclusive right of sale in Lewis & Nelson would have

[Corbett *v.* Lewis.]

been at an end, and they could no longer assert a right to exclusive possession. But the jury did not find the fact in Corbett's favor, and the consequence is that he remains subject to the terms of the agreement, which, as before stated, clearly entitled Lewis & Nelson to exclusive possession of the lumber for purposes of sale.

The court is complained of for submitting, without evidence, the question whether Corbett was intending and endeavoring to sell the lumber short of the Pittsburgh market, but even if well grounded, we see no force in the complaint, because Lewis & Nelson's right of sale was absolute and exclusive upon the agreement, and did not need to rest upon an ascertainment of the fact suggested. Corbett bound himself to deliver at Pittsburgh, but that was for their benefit, and they might waive their rights and demand delivery above Pittsburgh. It was like a power revocable at the pleasure of the principal, or like a bailor demanding possession of his own goods *in transitu*. If Lewis & Nelson found out a better market than Pittsburgh, the agreement permitted them to avail themselves of it, though if Corbett had already incurred the expenses of running to Pittsburgh he would be entitled to them in his account with Lewis & Nelson.

It is argued that if the lumber had been levied on as Corbett's property, either at the mill, or while in transit, a sheriff's sale would have passed a good title, and for this the case of Mitchell *v.* The Commonwealth, 1 Wright 187, is relied upon. That was not a case of bailment, at least it was not so stated, but of a lease that amounted to a purchase of the goods, and it was said they would be liable to levy and sale in the hands of the purchaser, though he had not paid for them, but here, upon our construction of the agreement, Corbett, though holding an equitable interest in the lands, was to have no property in the timber severed from the freehold until he had manufactured enough, at the specified rates, to reimburse the capitalists their outlays. The manufactured lumber must have been the exclusive property of Lewis & Nelson, else they could not have the "full and entire control of the sale of it." What Corbett had in it was a right to charge the specified prices against their advances. His labor mixed with the lumber was to be compensated in this manner, but the property in the lumber, until advances should be reimbursed, was in Lewis & Nelson, and not in him, and, therefore, we cannot admit that a sheriff's levy or sale of the lumber as his property, would have passed any title whatever.

The only remaining assignment of error relates to that portion of the lumber which was manufactured out of timber not grown upon the plaintiff's lands, but the only ground of complaint here is that there was not evidence to raise the question which the

[Corbett *v.* Lewis.]

court submitted to the jury.' I say the only ground, for if there was such evidence no just exception can be taken to the instructions. If Corbett bought the timber as the agent of the plaintiffs, and with their money, the jury were properly instructed that the property would be in the plaintiffs, and not in him. But, was there evidence? It is indeed slight, though Newton Taylor says of the logs he put in as a part of the Clark lumber, that he understood they were for Lewis & Nelson. Corbett bought the timber, but from the drafts, receipts and letters that passed between the parties, it was possible for the jury to infer that these purchases were made on the general account of the mill.

But there was a part of the charge which covers this lumber, that is not assigned for error. It was the part that related to the confusion of goods. Now if the jury failed to find evidence that Corbett acted as agent for Lewis & Nelson, in buying lumber from other lands than theirs, to be manufactured at their mill, and so found *him* to be the owner of such lumber, yet if he confused and mixed it with theirs, and made his boards undistinguishable from theirs, the instruction was that he would lose his property, and this is not assigned for error.

Whatever the mistake in submitting the question of agency without adequate evidence, here was a view of the case, acquiesced in by the plaintiff in error, which justified the jury in finding a verdict against him.

On the whole, therefore, we find none of the errors sustained, and accordingly the judgment is affirmed.